CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 10 2021

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| SABRINA R., on behalf of S.P.,[1] | ) | |
| a minor child, | ) | Civil Action No. 4:20-cv-00035 |
| Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Commissioner of Social Security | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Sabrina R., proceeding on behalf of her minor granddaughter S.P., asks this

Court to review the Commissioner of Social Security's final decision terminating S.P.'s

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B).

Having considered the administrative record, the parties' briefs, and the applicable law, I cannot

find that substantial evidence supports the Commissioner's decision to terminate benefits.[3]

Accordingly, I recommended that the final decision be reversed and the case be remanded under

the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials. The Court always refers to minors by their initials.

[2] Commissioner Kijakazi is hereby substituted for Andrew M. Saul as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[3] I decline Sabrina's request for oral argument, Pl.'s Br. 22, ECF No. 19, because the facts and legal positions are adequately presented in the materials before the court and a hearing would not aid the decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2). The Commissioner did not request oral argument.

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. Legal Framework

A child is "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected

2

to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Social Security ALJs follow a three-step process to determine in the first instance whether a child claimant is disabled. The ALJ asks in sequence whether the child: (1) is working; (2) has a severe medically determinable impairment; and, if so, (3) has an impairment or combination of impairments that meets, medically equals, or functionally equals any of the disabling impairments listed in the Act's regulations. *Bryant v. Barnhart*, 63 F. App'x 90, 92–93 (4th Cir. 2003); 20 C.F.R. § 416.924(a).[4]

Step three has two parts. The ALJ must first consider whether the child's severe impairment(s) meets or medically equals the criteria for any specific listed impairment. 20 C.F.R. §§ 416.925, 416.926; *see Sullivan v. Zebley*, 493 U.S. 521, 529–34 (1990). If it does, the child "is conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of N.Y.*, 476 U.S. 467, 471 (1986); *see* 20 C.F.R. § 416.924(d)(1). If it does not, the ALJ moves on to the "functional equivalence" part of step three. 20 C.F.R. § 416.926a. This holistic, fact-specific determination requires the ALJ to evaluate how appropriately, effectively, and independently the child performs in "six domains" of functioning when compared to other children the same age "who do not have impairments," *id.* § 416.926a(b)(1), and to "rate the severity" of the child's impairment-related limitation in each affected domain, SSR 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009).[5] To "functionally equal" the listings, the child's medical impairment(s) must cause

---

[4] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[5] "Domains are broad areas of functioning intended to capture all of what a child can or cannot do," SSR 09-01p, 2009 WL 396031, at *2, both on a day-to-day basis and over time, *id.* at *9–10 & n.17. The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) overall health and physical well-being. 20 C.F.R. § 416.926a.

"marked limitation" in two domains or "extreme limitation" in one domain.[6] 20 C.F.R. §

416.926a(d). The claimant bears the burden of proving that he or she is disabled. *S.R. ex rel. R.R.*

*v. Barnhart*, 371 F. Supp. 2d 796, 799 (W.D. Va. 2005).

The Commissioner must periodically review a disabled child's eligibility for benefits. 42

U.S.C. § 1382c; 20 C.F.R. § 416.994a(a) (2015). The central questions in these continuing

disability reviews ("CDR") are whether the child "has experienced 'medical improvement'" in

his or her disabling impairment(s) and, if so, whether the child nonetheless is still disabled.

*Powell v. Astrue*, Civ. No. TMD-08-840, 2010 WL 3245414, at *2 (D. Md. Aug. 17, 2010); *see*

20 C.F.R. § 416.994a(b)(1)–(3). "Medical improvement is any decrease in the medical severity"

of the impairment(s) that "was present at the time of the most recent favorable decision that [the

child was] disabled or continued to be disabled."[7] 20 C.F.R. § 416.994a(c). The Commissioner

bears the burden of showing medical improvement. *Edwards v. Astrue*, No. 4:12cv5, 2012 WL

6082898, at *3 (W.D. Va. Dec. 6, 2012). If there has been medical improvement, then the ALJ

considers whether the child's impairment(s) still "meets or medically or functionally equals the

severity of the Listing [that] it met or equaled at the time of the previous determination." *Baker*

*ex rel. Baker v. Barnhart*, 410 F. Supp. 2d 757, 761 (E.D. Wis. 2005); *see* 20 C.F.R. §

416.994a(b)(2) (explaining that the ALJ must consider the impairment(s) under the relevant

Listing "as it was written at that time, even if it has been revised or removed from the Listing of

Impairments" since the CPD). If the once-disabling impairment(s) no longer meets or equals the

---

[6] "Marked limitation" means the "impairment(s) interferes seriously" with the child's "ability to
independently initiate, sustain, or complete activities" compared to children the same age who do not
have impairments. 20 C.F.R. § 416.926a(e)(2). "Extreme limitation" means the "impairment(s) interferes
very seriously with [the] ability to independently initiate, sustain, or complete activities" compared to
children the same age who do not have impairments. *Id.* § 416.926a(e)(3).

[7] This is called "the 'comparison point decision' or 'CPD.'" *Powell*, 2010 WL 3245414, at *2.

comparison-point Listing, then the ALJ follows the regular three-step process to determine whether the child currently has a severe medically determinable impairment(s) that meets, medically equals, or functionally equals the Listings. *Id.* If not, the Commissioner may terminate the child's benefits. *See* 42 U.S.C. § 1382c(a)(4)(B)(i).

### III. Background

S.P. and her twin brother were born on August 7, 2013, at twenty-six weeks gestational age following a complicated pregnancy. *See* Administrative Record ("R.") 844–52, 855, ECF No. 14. S.P. weighed 730 grams, or 1.9 pounds, at birth and remained in the neonatal intensive care unit ("NICU") for three months. R. 847. On September 17, 2013, Disability Determination Services ("DDS"), the state agency, found that S.P. was disabled based on her low birth weight. R. 68 ("[B]irth weight of 730 grams . . . was a functional equ[ivalent] by example for infants weigh[ing] less than 1200 grams. This resulted in a finding of 'disabled' with an onset of 08/07/2013[.]"); *see* R. 90 (citing 20 C.F.R. § 416.926a(m)(6) ("The following are some examples of impairments and limitations that functionally equal the listings. . . . Infants weighing less than 1200 grams at birth, until attainment of 1 year of age.") (2013))). In December 2015, DDS notified Sabrina that S.P.'s benefits would be terminated because medical records showed her height and weight improved as of December 5, 2015, and S.P. did not have any other medical impairments that met, medically equaled, or functionally equaled the childhood listings. R. 68, 92. A Disability Hearing Officer upheld this determination in July 2017. R. 88–94.

In May 2019, Sabrina appeared with counsel and testified at an administrative hearing before ALJ H. Munday. *See* R. 37–66. S.P., then age five, sat in the waiting area during the hearing. R. 40. ALJ Munday issued an unfavorable decision on May 28, 2019. R. 15–30. She first explained that the CPD was DDS's September 2013 decision finding S.P. disabled based on

low birth weight. R. 18. ALJ Munday found that "[m]edical improvement occurred as of December 1, 2015," because S.P.'s "weight increased" and she "attained age 1 before" that date.[8] R. 18–19 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 100.04(A) (2019)). She then found that S.P.'s birth weight had not functionally equaled the childhood listings since December 1, 2015, because the impairment caused "less than marked limitation[s]" in S.P.'s abilities to attend and complete tasks, move about and manipulate objects, and her overall health and physical well-being, R. 20–21, 22–23, 24–25, and "no limitation[s]" in her abilities to acquire and use information, interact with others, and care for herself, R. 19–20, 21–22, 23–24, compared to other toddlers and preschoolers who do not have impairments, R. 19 (finding S.P. was an "older infant/toddler" (ages 1 to 3 years) in December 2015, and a preschooler (ages 3 to 6 years) in May 2019). *See generally* R. 20–24 (citing R. 182–86, 538–39, 548–53, 568, 572, 782, 827–43). Thus, ALJ Munday concluded that S.P.'s prior disability ended on December 1, 2015. R. 30.

ALJ Munday then followed the regular three-step process to determine whether S.P. had any severe medically determinable impairment(s) that still entitled her to disability benefits after December 2015. *See* R. 25–30. S.P. had four severe impairments during this time: "chronic lung disease, attention deficit hyperactivity disorder, mood lability, and disruptive disorder." R. 25.

---

[8] Sabrina does not challenge ALJ Munday's findings that S.P. experienced medical improvement and that her low birth weight no longer met or equaled the regulation under which S.P. was found disabled in 2013. *See generally* Pl.'s Br. 16–22. I note, however, that ALJ Munday "did not actually compare the medical evidence of [S.P.'s] condition at the time of the CPD to the current severity of the condition," *Smiley v. Saul*, No. 1:19cv163, 2020 WL 3259541, at *2 (W.D.N.C. June 16, 2020), before concluding that her low birth weight medically improved, R. 18–19. *See Lakesha B. o.b.o. N.A.R. v. Saul*, No. 4:19cv35, 2021 WL 372798, at *4–5 (W.D. Va. Feb. 3, 2021). ALJ Munday also did not cite any evidence to support her findings that S.P.'s "weight increased" and she "attained age 1" before December 1, 2015. R. 19; *see* 20 C.F.R. § 416.1453(a) ("The [ALJ] must base the decision on the preponderance of the evidence . . . included in the record."). The Commissioner must correct this legal error on remand. *Lakesha B.*, 2021 WL 372798, at *5 (citing *Edwards*, 2012 WL 6082898, at *4 ("The ALJ may very well determine that Plaintiff [medically] improved and that he was not disabled after July 9, 2010, but Plaintiff is entitled to have his case reviewed under the proper legal metrics.")).

Those impairments did not meet or medically equal any specific childhood Listing. *See* R. 25–26

(citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 103.02, 112.11). ALJ Munday next summarized

some of Sabrina's statements, R. 26–27 (citing R. 47–50, 55–56, 182–86), and S.P.'s medical

records created since December 1, 2015, *see* R. 27–28 (citing R. 511–17, 538–39, 548–58, 568–

75, 797–823, 827–43, 923–31). Finally, ALJ Munday rated S.P.'s limitations in each domain, R.

29–30, that were related to her "history of chronic lung disease, attention deficit hyperactivity

disorder, mood lability, and disruptive behavior," R. 27. Once again, and relying on the same

evidence she did in the CDR portion of her decision, ALJ Munday found that S.P. had "less than

marked limitation" attending and completing tasks, moving about and manipulating objects, and

in her overall health and physical well-being, R. 29–30, and "no limitation" acquiring and using

information, interacting with others, and caring for herself at an age-appropriate level, R. 29. *See*

R. 20–24, 29 (citing R. 182–86, 538–39, 548–53, 568, 572, 782, 827–43). Accordingly, ALJ

Munday concluded that S.P.'s benefits could be terminated because her disability ended as of

December 1, 2015, and she had not become disabled since that date. R. 30.

## IV. Discussion

Sabrina argues ALJ Munday did not explain why she concluded that S.P.'s severe mental

impairments caused "no limitation" acquiring and using information and "less than marked"

limitation attending and completing tasks, R. 29, or how she weighed evidence indicating that

S.P. had more significant functional limitations in these domains compared to other children her

age. *See generally* Pl.'s Br. 16–22 (citing R. 48–50, 56, 59–60, 64–65, 203, 209, 217, 355, 365,

368, 386, 828, 830–31, 833, 835, 837, 839, 842). Her arguments are persuasive. While I cannot

say S.P.'s record conclusively shows that her severe mental impairments caused "marked

limitation[s]" in both domains since December 1, 2015, *id.* at 18, 20, I also cannot say substantial

evidence supports ALJ Munday's findings that S.P. did not have such serious limitations, *see* R. 29 (citing R. 182–86, 538–39, 572, 827–43). Accordingly, the case should be reversed and remanded. *See, e.g.*, *Lakesha B.*, 2021 WL 372798, at *4–5; *Elsie L. v. Berryhill*, No. 4:17cv50, 2018 WL 6981223, at *3 (W.D. Va. Dec. 4, 2018), *adopted*, 2019 WL 137617 (W.D. Va. Jan. 8, 2019).

\*

ALJs use a special technique called the "'whole child' approach" to determine whether a child's medical condition(s) functionally equals the listings. SSR 09-1p, 2009 WL 396031, at *1; *see* 20 C.F.R. § 416.926a. The ALJ "focus[es] first on the child's activities" and "evaluate[s] how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments." SSR 09-2p, 2009 WL 396032, at *1 (Feb. 18, 2009). After the ALJ "determine[s] how the child functions in all settings" and identifies which of the child's "activities are limited," she then considers which "domains are involved in those activities." SSR 09-1p, 2009 WL 396031, at *2. "Domains are broad areas of functioning intended to capture all of what a child can or cannot do," *id.* at *1, both on a day-to-day basis and over time, *id.* at *9–10 & n.17. The ALJ must account for "the interactive and cumulative effects" of the child's medical impairment(s) and related symptoms[9] on her activities "in any and all of the domains that [she] uses to do those activities, based on the evidence in the case record." *Id.* at *2. Finally, the ALJ "rate[s] the severity" of the child's overall impairment-related limitation (e.g., "moderate," "marked," "extreme") in each affected domain to determine whether

---

[9] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. § 416.902(n). "If the claimant is a child who does not describe, or cannot adequately describe, his [or her] symptoms the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian." *Gerette v. Colvin*, No. 7:15cv12, 2016 WL 1254611, at *8 (W.D. Va. Feb. 2, 2016) (internal quotation marks omitted), *adopted*, 2016 WL 1296082 (W.D. Va. Mar. 30, 2016).

the child is disabled. *Id.* A child is entitled to disability benefits if her medical impairment(s) cause "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

"The critical element in [rating] the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities," SSR 09-2p, 2009 WL 396032, at *3, compared to the expected "functioning of other children the same age who do not have impairments," *id.* at *11. *See Johnson*, 2018 WL 1726422, at *3 (reversing and remanding in part because ALJ compared child's functioning to other children who received special-education services and accommodations); 20 C.F.R. §§ 416.924b(a), 416.926a(b). The ALJ should evaluate "the kind, extent, and frequency of help or adaptations the child needs," the settings where the child has trouble, and "all other factors" and evidence relevant to rating her limitations, SSR 09-1p, 2009 WL 396031, at *3, considering her chronological age throughout the relevant period, 20 C.F.R. § 416.924b(a). *See L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152–53 (7th Cir. 2019). For most domains, the regulations include skills or activities "that illustrate the typical functioning of children in [five] different age groups,"[10] plus "examples of limitations within the[se] domains." 20 C.F.R. § 416.926a(b)(1). Because "the examples do not necessarily describe a 'marked' or 'extreme' limitation," however, the ALJ must "consider all of the relevant information in [the] case record" when rating the claimant's limitations compared to typical children within her same age group(s). *Id.* § 416.926a(i)(3).

Sabrina focuses on Domain I, "Acquiring and Using Information" and Domain II, "Attending and Completing Tasks." *See* Pl.'s Br. 16–20. Domain I considers how well the child

---

[10] Those age groups are: Newborns and young infants (birth to age 1 year); older infants and toddlers (ages 1 to 3 years); preschool children (ages 3 to 6 years); school-age children (ages 6 to 12 years); and adolescents (ages 12 to 18 years). *See* 20 C.F.R. § 416.926a; SSR 09-1p, 2009 WL 396031, at *1 n.7.

learns information and how well she uses the information she has learned. R. 19 (citing 20

C.F.R. § 416.926a(g)). "Older infants and toddlers" without impairments should "learn how

objects go together" through play; refer to themselves and to "things around [them] by pointing

and eventually naming"; "solve simple problems" through imitation and play; and "begin to

respond to increasingly complex instructions and questions" using "an increasing number of

words and grammatically correct simple sentences." 20 C.F.R. § 416.926a(g)(2)(ii). Preschool-

aged children should know and demonstrate all the "readiness skills" that will help them read,

write, and do arithmetic when they enter primary school. *Id.* § 416.926a(g)(2)(iii). These skills

include listening to stories, matching letters, and "[u]sing words to ask questions, give answers,

follow directions, describe things, explain what you mean, and tell stories." *Id.* Domain II

considers how well the child "focus[es] and maintain[s] attention" and how well she begins,

carries through, and finishes activities, "including the pace at which she performs" or transitions

between them. R. 20; *see* 20 C.F.R. § 416.926a(h). Toddlers without impairments "should

demonstrate sustained attention, such as when looking at picture books, listening to stories, or

building with blocks, and when helping" caregivers dress them. 20 C.F.R.§ 416.926a(h)(2)(ii).

Preschoolers should pay attention when spoken to directly, sustain concentration on play and

learning activities, and perform some tasks like feeding and dressing themselves. They "usually"

should be able to wait their turn and change activities when an adult "says it is time to do

something else." *Id.* § 416.926a(h)(2)(iii).

"There is no set formula" for determining functional equivalence. SSR 09-1p, 2009 WL

396031, at *9–10. The "child's day-to-day functioning may be considered 'seriously' or even

'very seriously' limited whether [her] impairments impact only one activity or limit several

activities" within a domain. *R.S. ex rel. Herrera v. Berryhill*, 357 F. Supp. 3d 1033, 1037 (C.D.

Cal. 2019) (quoting SSR 09-1p, 2009 WL 396031, at *9). Additionally, because "the effects of a child's impairments are considered" over time, the child can "have a 'marked' or 'extreme' limitation in a domain 'even though [she] does not have serious or very serious limitations every day.'" *Id.* (quoting SSR 09-1p, 2009 WL 396031, at *9). Determining whether the child has "marked" or "extreme" limitations "depends on the importance and frequency of the limited activities and the relative weight" of all available evidence. SSR 09-1p, 2009 WL 396031, at *9, *10 ("[T]he rating of limitation [in] a domain is not an 'average' of what activities the child can and cannot do."). The ALJ "must consider each piece of evidence in the context of the remainder of the case record" to get "a full picture" of the child's activities and limitations, SSR 09-2p, 2009 WL 396032, at *12 n.24, compared to other children in the same age group(s) who do not have impairments, 20 C.F.R. §§ 416.924b(a), 416.926a(b). *See Krystal H. o.b.o. C.H. v. Saul*, No. 4:18cv68, 2020 WL 809246, at *8–9 (W.D. Va. Jan. 24, 2020), *adopted*, 2020 WL 806183 (W.D. Va. Feb. 18, 2020); *Johnson*, 2018 WL 1726422, at *3. The ALJ's decision should "provide sufficient detail" describing how she weighed that information so subsequent reviewers can understand why she made her findings. SSR 09-1p, 2009 WL 396031, at *3.

**

ALJ Munday's decision does not satisfy this standard. To start, too much of her assessment was devoted to summary, R. 26–28, and not enough to logical, accurate analysis of the pertinent factors and all relevant evidence in S.P.'s record, R. 29–30. *See Lakesha B.*, 2021 WL 372798, at *9. Her entire discussion of S.P.'s impairment-related limitations—or lack thereof—in Domain I and Domain II during the relevant time appears in two terse paragraphs:

> <u>Since December 1, 2015 and through the date of this [May 28, 2019] decision, the claimant has had no limitation in acquiring and using information.</u> The claimant was able to use words to ask for objects and people (Ex. 1E). She was able to identify and name objects in pictures. During appointments, she was able to speak

> in complex sentences and respond appropriately to questions. Her examinations
> consistently found good memory and fund of information. (Exs. 7F/17–18; 16F).
>
> <u>Since December 1, 2015 and through the date of this decision, the claimant has had</u>
> <u>less than marked limitation in attending and completing tasks.</u> The claimant's
> grandmother reported that she could maintain attention to listen to stories for more
> than 5 minutes and independently initiate play activities (Exs. 1E; 7F/17–18). Her
> behavior during appointments was active, but largely age appropriate. She was able
> to cooperate and remain seated during examinations. (See e.g. Exs. 11F/7; 16F).

R. 29 (citing R. 182–86 (Ex. 1E, Sept. 2015); R. 538–39 (Ex. 7F, Dec. 2015); R. 572 (Ex. 11F,

Jan. 2017); R. 827–43 (Ex. 16F, Mar. 2018–Mar. 2019)). In short, ALJ Munday "summarized

evidence that [s]he found credible, useful, and consistent," but she never explained how she

concluded, "*based on this evidence*," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), that

S.P.'s medical impairments did not interfere seriously (or at all) with the her age-appropriate

functioning in these two domains.

    "The missing analysis is especially troubling" for ALJ Munday's finding that S.P.'s had

"no limitation" acquiring and using information because the record contains uncontradicted

evidence that S.P. was limited in this domain—"evidence that the ALJ did not address," *Mascio*,

730 F.3d at 637. *See Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact

does not mean that we credit even those findings contradicted by undisputed evidence."). For

example, S.P.'s educational records document "significant delays in her expressive language,

cognitive skills, and adaptive behavior" when she enrolled in an early childhood learning

program at age two, R. 209, which qualified her for an Individualized Educational Plan ("IEP")

based on disabilities of "Developmental Delay" and "Speech/Language Impairment," R. 380. *See*

*generally* R. 201–23, 376–82 (annual IEP and related notes) (Nov. 2015); R. 383–86

(psychoeducational evaluation report showing "delayed" cognitive skills in the first percentile,

age equivalent 16 months, and "below average" communication skills in the eighth percentile,

age equivalent 20 months) (Oct. 2015); R. 392–93 (speech-language evaluation report showing

expressive language equivalent to a 9–12 month old infant) (Oct. 2015). In December 2015,

S.P.'s social worker opined that the toddler (age 28 months) was "not yet showing skills used by

other children her age" in the area of "Acquires and Use of Knowledge and Skills," but that she

"use[d] may important skills that are necessary for more advanced skills" in this area. R. 538.

She estimated that S.P. had fewer than 50 words in her spoken vocabulary and noted S.P. will

"imitate[] many words, phrases, and sounds but [did] not spontaneously use many words." *Id.*

She used "pronouns including 'me' and 'you,' but she [did] not always use these words

correctly." *Id.* S.P. could "use some single words" to request things she wanted. *Id.*; *accord* R.

205 ("[S.P.] uses fewer than 50 words expressively and typically speaks in 1 word utterances.

She is able to string together words to form simple phrases, but this is infrequent. [She] has a

hard time . . . . answering questions[] and following basic commands.") (Nov. 2015).

Conversely, "[o]ther children [S.P.'s] age have a vocabulary of 100+ words, use simple

sentences, . . . can tell what common items are used for . . . . and us[e] 2–3 word sentences to

request what they want, including food and drink." *Id.* During the 2015–2016 school year, S.P.

attended a half-day preschool program and received all academic instruction in a self-contained

classroom, R. 217, 549, with other children who had disabilities, R. 220. *See generally* R. 208–

20, 245–47. She also received speech therapy for thirty minutes a week, R. 217, until February

2017, *see* R. 337, 360. During the 2017–2018 school year, S.P. spent "the majority of her day in

a general education preschool classroom" and did well in that setting. R. 337; *see* R. 348–52,

360–72. Her annual IEP dated February 20, 2018, shows that she still received some classroom

accommodations and special-education instruction for literacy and math. R. 365, 368.

ALJ Munday never mentioned S.P.'s educational records in her decision, R. 19–28. *See*

20 C.F.R. § 416.924a(b)(7)(iv) ("We will consider the fact that you attend school, that you may

be placed in a special education setting, or that you receive accommodations because of your impairments."); *Drake v. Astrue*, No. 10-C-0420, 2011 WL 4349370 at *7 (E.D. Wis. Sept. 15, 2011) ("Mindful that the ALJ was not required to discuss every piece of evidence, there is a need to discuss all relevant evidence creating a logical bridge to the result domain."); *cf. Lataures L. v. Comm'r of Soc. Sec.*, No. 4:18cv67, 2020 WL 2066756, at *5 (W.D. Va. Mar. 27, 2020) (recommending reversal where ALJ failed to acknowledge information in adult claimant's education records, including that she received special-education services in a self-contained classroom, that undermined ALJ's findings about her adaptive functioning), *adopted*, 2020 WL 2065872 (W.D. Va. Apr. 29, 2020).

ALJ Munday did cite the social worker's report that S.P. "used many skills that were necessary for the development of more advanced skills," R. 27 (citing R. 538–39), but she failed to mention her comment that S.P. was "not yet showing skills used by other children her age" when it came to acquiring and using "[k]nowledge and [s]kills," R. 538. *Cf. Lewis*, 858 F.3d at 869 (reversing and remanding where ALJ "cherrypick[ed]" evidence of normal findings on claimant's physical exams while "ignoring evidence . . . . [i]n the same medical records" that supported claimant's reports of constant shoulder pain). She also misunderstood this report's content in finding S.P. "was able to use pronouns and make simple sentences" by December 2015. R. 27 (citing R. 538–39). The social worker did say S.P. knew some pronouns, but she added that S.P. did "not always use these words correctly" and had a very limited vocabulary compared to her age-peers, R. 538. *Cf. Woods*, 888 F.3d at 694 ("An ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them."). The report mentions "simple sentences" in the context of describing how well "[o]ther children" communicate, not in finding that S.P. had the same age-appropriate skills. R.

538 ("[S]he is not yet showing skills used by other children her age in this area."). On the

contrary, the social worker noted that S.P. "use[d] some single words to request what she wants"

whereas "[o]ther children [her] age are using 2–3 word sentences to request what they want[.]"

*Id.* Considered in context, the report is consistent with other records showing S.P. "typically

sp[oke] in 1 word utterances" and had trouble answering questions, "following basic

commands," and expressing herself at an age-appropriate level. R. 205; *see also* R. 551 ("She

was speaking in 3 word phrases. Not using pronouns consistently.") (Jan. 2016). Moreover,

evidence that S.P. "spoke in *relatively* complex sentences and responded appropriately to

questions" during *one* doctor's visit in January 2017, *compare* R. 27 (citing R. 572) (emphasis

added), *with* R. 29 ("During appointments, she was able to speak in complex sentences and

respond appropriately to questions."), should "not negate the difficulties" S.P. had learning

information and expressing herself, SSR 09-1p, 2009 WL 396031, at *10. *See Lakesha B.*, 2021

WL 372798, at *11 (recommending reversal where ALJ made similar error); *Genean S. o.b.o.*

*Z.S. v. Saul*, No. 4:20cv7, 2021 WL 561368, at *8 (W.D. Va. Feb. 16, 2021) (same); *Cynthia N.*

*o.b.o. Z.N.S.*, No. 4:18cv38, 2019 WL 4658391, at *5 (W.D. Va. Aug. 29, 2019) (same),

*adopted*, 2019 WL 4644550 (W.D. Va. Sept. 24, 2019); *cf. Kemp v. Astrue*, Civ. Act. No. 6:08-

313, 2009 WL 580336, at * (D.S.C. Mar. 5, 2009) (finding that the ALJ's reliance on "isolated

snippets of evidence that support[ed] his ultimate conclusion[,] without reconciling the evidence

that directly contradicted" the conclusion or "present[ing] a full picture that accurately

reflect[ed]" all relevant evidence in the record, was reversible error).

   Young children who do not have impairments should "begin to respond to increasingly

complex instructions and questions" using "an increasing number of words and grammatically

correct simple sentences," 20 C.F.R. § 416.926a(g)(2)(ii) (ages 1 to 3 years), and demonstrate all

the "readiness skills" that will help them learn how to read, write, and do simple math when they

enter primary school, *id.* § 416.926a(g)(2)(iii) (ages 3 to 6 years). The regulations instruct that a

child who "talks only in short, simple sentences, and has difficulty explaining what she means,"

R. 20, would be considered to have "limited functioning in acquiring and using information," 20

C.F.R. § 416.926a(g)(3). *See* R. 19–20. S.P.'s educational records—especially her preschool IEP

and evaluations documenting significant cognitive and language delays—could support a finding

that S.P.'s medical impairments "interfere[d] seriously," 20 C.F.R. § 416.926a(e)(2), with her

abilities to learn and use information compared to other young children without impairments.

Yet, ALJ Munday found S.P. had "no limitation" in this domain. R. 29. Her failures to consider

fairly all relevant evidence in S.P.'s record, and "to build an accurate and logical bridge from the

evidence [s]he recounted to [her] conclusion," *Woods*, 888 F.3d at 694, are reversible errors. *See*

*Lakesha B.*, 2021 WL 372798, at *9–11; *Cynthia N.*, 2019 WL 4658391, at *5; *Elsie L.*, 2018

WL 6981223, at *3, *6–8.

ALJ Munday also made two legal errors when weighing Sabrina's testimony describing

how S.P.'s mental impairments and related symptoms limited her abilities to attend and complete

tasks compared to other children her age who do not have impairments. *See* Pl.'s Br. 19–22

(citing R. 28). "Symptoms," or the claimant's own description of her medical condition, play a

crucial role in a proper functional-equivalence assessment. SSR 09-1p, 2009 WL 396031, at *2.

"If the claimant is a child who does not describe, or cannot adequately describe, his [or her]

symptoms the ALJ will accept as a statement of [the child's] symptom(s) the description given

by the person who is most familiar with [the child], such as a parent, other relative, or guardian."

*Gerette*, 2016 WL 1254611, at *8. The ALJ must follow the same two-step process to evaluate

16

the caregiver's testimony about the child's medical condition, just as she would if the child claimant were testifying. *See id.*; 20 C.F.R. § 416.929.

"First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, the ALJ must evaluate the intensity, persistence, and limiting effects of the child's symptoms to determine the extent to which they limit her ability to function at an age-appropriate level. *See Gerette*, 2016 WL 1254611, at *8; 20 C.F.R. § 416.929(c). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, based on all the relevant evidence in the record. 20 C.F.R. §§ 416.924a, 416.926a, 416.929(c)(3). The ALJ must give specific, legally adequate reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, she should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640.

Sabrina alleged that S.P. "is disabled by her poor attention [and] disruptive behavior" related to her severe mental impairments. R. 26; *see* R. 48–49, 56 (May 2019); R. 185–87 (Sept. 2015). S.P. did not qualify for an IEP when she entered kindergarten in the spring of 2018. *See* R. 336–41. At the ALJ hearing in May 2019, however, Sabrina testified that S.P. had an IEP at the time, R. 56, and educators had recently decided S.P. needed to resume "intervention classes" and other therapies because she was not ready for first grade, R. 59–60. Sabrina reported similar concerns to S.P.'s psychiatrist, Richard Claytor, M.D., in March 2019. *See* R. 841 ("[G]randma states that [S.P.'s] teacher informed her that if [S.P.] could not follow the rules and stay in her seat then she may not be able to move into first grade."). Dr. Claytor started treating S.P. for

ADHD, mood lability, and a disruptive disorder when she was four years, eight months old. *See* R. 830–31 (Apr. 2018). His exam notes show that S.P.'s thought process was "[l]ogical," but "tangential at times," her attention/concentration was "[i]mpaired albeit improved with effort," her judgment/insight were "[f]air," and her recent/remote memory was "[i]ntact" at every visit through March 2019. R. 828, 830–31, 835, 837, 839, 842. That May, Sabrina testified that S.P., age five years, nine months, did not cooperate, had a poor attention span, was "easily distracted," and needed to "be redirected constantly at school and at home." R. 48–49, 56. Her kindergarten teacher had reported that she "crawls on the tables" during class and "gets into the cubbies or play areas when she should be sitting on the carpets." R. 49. She also showed Sabrina a video of S.P. throwing "boxes of blocks or toys, or rolling on the floor and kicking the chairs" in class. R. 50. Sabrina estimated that S.P. spent at least half of her time at school either in "time out" or in the principal's office because of her disruptive behavior. *See* R. 49–50, 63–64. "Two or three" times a month, Sabrina had to pick up S.P. early because there were not enough teachers to help calm her down. R. 64–65.

ALJ Munday referenced some of Sabrina's statements when summarizing the record, *see* R. 26–27 (citing R. 49–50, 63–65, 182–86), and to support her finding that S.P. had "less than marked" limitations attending and completing tasks, R. 29 ("The claimant's grandmother reported that she could maintain attention to listen to stories for more than 5 minutes and independently initiate play activities.") (citing R. 185, 538). She found that S.P.'s medical impairments "could reasonably be expected to cause the alleged symptoms" Sabrina had described, but that Sabrina's statements

> concerning the intensity, persistence and limiting effects of [S.P.'s] symptoms *are not persuasive* for the period since December 1, 2015 and through the date of this decision, *to the extent that they are inconsistent with finding* that the claimant *does*

> *not have an impairment . . . that functionally equals the listings* for the reasons
> explained below.

R. 27 (emphasis added). Put differently, ALJ Munday appears to have found Sabrina's

allegations "persuasive" only to the extent that they were "consistent with" the ALJ's own

conclusion that S.P. was "not disabled" after December 1, 2015. R. 27, 30. This "'gets things

backwards' by implying that 'ability to [function] is determined first and is then used to

determine the claimant's credibility.'" *Mascio*, 780 F.3d at 639 (quoting *Bjornson v. Astrue*, 671

F.3d 640, 644–45 (7th Cir. 2012)). It "also conflicts with the agency's own regulations" for

evaluating symptoms, *id.* (citing 20 C.F.R. § 416.929(a)), which direct ALJs to determine the

extent to which a child claimant's alleged symptoms and related functional limitations "can be

reasonably accepted as consistent with the medical signs . . . and other evidence to decide" how

the child's symptoms affect her functioning, 20 C.F.R. § 416.929(a). ALJ Munday "should have

compared [S.P.'s] alleged functional limitations . . . to other evidence in the record," *Mascio*, 780

F.3d at 639, and not to her conclusion that S.P.'s impairments did not "functionally equal[] the

listings," R. 28.

The ALJ's "error would be harmless if [s]he properly analyzed credibility elsewhere" in

her decision, but she did not. *Mascio*, 780 F.3d at 639. First, ALJ Munday's sole reason for

rejecting Sabrina's testimony was her conclusion "[t]he record [did] not support the claimant's

allegations regarding the severity of her symptoms and limitations," R. 28, followed by citations

to "evidence that [s]he appeared to believe tended to discredit [this] testimony," *Monroe v.

Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). *See* R. 28 ("[S.P.] showed many age expected skills. .

. . She was able to speak in complex sentences and respond to questions appropriately. She

exhibited good memory and fund of knowledge. . . . [She] was able to sit through and cooperate

with medical appointments and entertain herself by initiating play activities.") (citing R. 538–39,

19

572, 827–43). Material conflicts or inconsistencies between a caregiver's description of a child's limitations and other specific relevant evidence in "the record," R. 28, are legitimate reasons to discount the caregiver's statements. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014); *Robin F. o.b.o. J.R.F. v. Berryhill*, No. 4:17cv21, 2018 WL 10802683, at *6, *9 (W.D. Va. Aug. 21, 2018). Here, however, ALJ Munday "failed to build an accurate and logical bridge" from the few examples she cited to her "conclusion that [Sabrina's] testimony was not credible." *Monroe*, 826 F.3d at 189; *see Genean S.*, 2021 WL 561368, at *8.

Second, ALJ Munday overlooked or downplayed evidence that supported Sabrina's allegations, including Sabrina's recent comment to Dr. Claytor that S.P.'s kindergarten teacher said S.P. "may not be able to move into first grade" if she "could not follow the rules and stay in her seat" during class, R. 841; *see* R. 49–50, 56, 63–65, and Dr. Claytor's findings that S.P. always exhibited some deficits in attention, concentration, thought process, judgment, and insight on exams in 2018 and 2019, *see* R. 828, 830–31, 835, 837, 839, 842. *See* R. 28 ("She exhibited some impairment of attention and concentration, but improved with effort. Her speech and thought process were coherent and logical. Her insight, judgment, and memory were intact[.]"). Young children who do not have impairments should pay attention when spoken to directly, sustain concentration on learning activities, and change activities when instructed to do so. 20 C.F.R. § 416.926a(h)(2)(iii). "Examples of limited functioning in attending and completing tasks" include repeatedly becoming sidetracked from tasks, frequently interrupting people, or requiring extra supervision to stay engaged in an activity the child has been instructed to perform. *Id.* § 416.929a(h)(3); *see* R. 20–21. Viewed in context, Sabrina's statements and Dr. Claytor's exam findings could support a conclusion that S.P.'s mental impairments caused serious (i.e., marked) limitations in this domain when compared to other children her age. *See*

*Krystal H.*, 2020 WL 809246, at *10; *Cynthia N.*, 2019 WL 4658391, at *5–7. The ALJ must explain how they factored into her conclusion that S.P. was not as limited as Sabrina alleged.

*** 

I take no position on whether S.P. is still entitled to disability benefits. On remand, the Commissioner must consider and apply the correct legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical stage of the continuing disability review, and provide an accurate, logical description of how specific evidence supports each conclusion in his functional equivalence assessment.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for summary judgment, ECF No. 18, **DENY** the Commissioner's motion for summary judgment, ECF No. 22, **REVERSE** the Commissioner's final decision terminating S.P.'s childhood SSI benefits, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 10, 2021.

Joel C. Hoppe
United States Magistrate Judge